**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JACOB EISENSTAT, *et al.*,          *
                                    *
      Plaintiffs,                 *
                                    *
      v.                          *          CIVIL ACTION NO.  PJM 05-1188
                                    *
JERRY D. WEAST, *et al.*,           *
                                    *
      Defendants.                 *

## OPINION

### I.

Larry and Diana Eisenstat, as parents and next friends of Jacob Eisenstat, sue Jerry D. Weast, Superintendent of Montgomery County Public Schools, and the Montgomery County Board of Education (collectively "Montgomery County Public Schools" or MCPS), under the Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1401 et seq. They contend that MCPS denied Jacob a free appropriate public education (FAPE), and seek reimbursement for the cost of educating him at a private educational facility during the 2002-2003 and 2003-2004 school years.

The Eisenstats have appealed the decision of the Administrative Law Judge (ALJ) who found that MCPS had not failed to offer Jacob a FAPE and that the Eisenstats were not entitled to reimbursement from MCPS for his private school placement. The Eisenstats ask the Court to reverse the ALJ's decision; MCPS asks the Court to affirm it. The parties have filed cross-motions for summary judgment and agree that disposition on that basis is proper.

For the reasons stated below, the Court DENIES the Eisenstats' Motion and GRANTS the Motion of MCPS.[1]

---

[1] Although neither party formulated as an issue on appeal the ALJ's conclusion that the Eisenstats were not statutorily barred from seeking reimbursement for tuition expenses at a private school based on the fact that Jacob had never received special education and related services from MCPS or any other public agency, MCPS raised this defense before the Court in their Reply brief

II.

Parents who contend that they have been forced, at their expense, to seek private schooling

for their child because a FAPE has not been provided by a local educational agency may seek

---

to the Opposition to their Cross-Motion for Summary Judgment. MCPS had previously raised this defense in a Motion to Dismiss, or in the alternative, for Summary Decision filed with the ALJ and the ALJ reserved ruling on the motion until her decision on the merits, at which time she denied the Motion and rejected the defense.   At the Court's request, the Eisenstats have submitted a supplemental brief on the issue as part of this appeal.

The question pertains to 20 U.S.C. § 1412(a)(10)(C) (2004), which provides as follows:

> (C) Payment for education of children enrolled in private schools without consent of or referral by the public agency.-
> (i) In general.-Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.
> "(ii) Reimbursement for private school placement.-If the parents of a child with a disability, *who previously received special education and related services under the authority of a public agency,* enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

(Emphasis added).  This meaning of the highlighted words is currently being debated in federal courts across the country. The First Circuit has adopted the position proposed by MCPS.  *See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004) and the Second Circuit and Eleventh Circuit have rejected it.  *See Frank G. v. Bd. of Educ.*, 459 F.3d 356, 367-69 (2d Cir. 2006); *M.M. v. Sch. Bd.*, 437 F.3d 1085, 1098-99 (11th Cir. 2006).  Within this District, Judges Motz and Chasanow have ruled that the plain language of the statute bars reimbursement even if a FAPE is not provided.  *See Baltimore City Bd. of Sch. Comm'rs v. Taylorch*, 395 F. Supp. 2d 246, 249 (D. Md. 2005) (Motz, J.); *Lunn v. Weast*, Civ No. 05-2363, 2006 WL 1554895, at *6-8 (D. Md. May 31, 2006) (Chasanow, J.), and Judge Williams has reached the opposite conclusion, *see Justin G. v. Bd. of Educ.*, 148 F. Supp. 2d 576, 587 (D. Md. 2001) (Williams, J.).  The Fourth Circuit has yet to take up the question but presumably will do so soon enough.  This Court, on reflection, has decided not to address the question in the present case since the Court concludes that Jacob was not in any event denied a FAPE, hence the Eisenstats are not entitled to reimbursement.

retroactive reimbursement from the authority in a due process hearing and, if dissatisfied with the result there, may pursue the matter in district court. *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 370 (1985). The parents run a significant risk: If it turns out that the child was offered a FAPE in timely fashion, reimbursement will be denied. *Id*; *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). If the parents demonstrate that no FAPE was provided and that the private school placement was proper under IDEA, reimbursement will be made. *Carter*, 510 U.S. at 15. However, "equitable considerations are relevant in fashioning relief," *Sch. Comm.*, 471 U.S. at 374, and the court has "broad discretion" in the matter. *Id.* at 369. The court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Carter*, 510 U.S. at 16.

In an IDEA case, the decision of the ALJ is deemed *prima facie* correct. *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1992). The district court must make a "bounded, independent decision" based on the administrative record and any additional evidence presented. *Id.* at 103. If the court determines not to follow the ALJ's factual findings, it must provide an adequate explanation for its decision. *Id.* at 105. The party challenging a decision of an ALJ bears the burden of demonstrating that the decision was erroneous. *Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256, 258 n.2 (4th Cir. 1998).

III.

The essential facts are not in dispute.

Jacob Eisenstat was born on December 20, 1996 with medical problems requiring numerous corrective procedures during his first two years of life. He has a history of Attention Deficit Hyperactivity Disorder (ADHD), Generalized Anxiety Disorder and Pervasive Developmental Disorder. He attended the Clara Barton Center for Children, a private pre-school program, in

September 2000.  Due to developmental and behavioral difficulties, he was transferred to the Lourie Center Therapeutic Nursery Program, another private program, for the remainder of school years 2000-2001 and 2001-2002.  The Lourie Center provided him with occupational and psychotherapy several times weekly, including individual and family therapy.

During the 2001-2002 school year, the Eisenstats completed an application for Jacob's admission to Kingsbury Day School, a full-time private school for learning disabled children. The parents were notified of his acceptance to Kingsbury on June 4, 2002 and signed an enrollment contract on June 10, 2002, stating that they were not seeking public funding for his placement.

On July 2, 2002, MCPS received a Private/Religious School Referral for Special Education Services packet from the Eisenstats relative to Jacob, with psychological evaluations, test scores, speech/language evaluations, teacher referral, classroom observation, and a parent questionnaire. A Central Individualized Education Program (CIEP) screening meeting with the parents and Lourie Center staff was convened on August 1, 2002.  Subsequent to the meeting, the team decided to review Jacob's previously submitted information and conduct further testing and evaluation.  MCPS then conducted an educational assessment, administrated the Brigance Diagnostic – Comprehensive Inventory of Basic Skills test (Brigance"), and observed Jacob in structured play, and reviewed his Physical Therapy report.  A subsequent IEP meeting was scheduled for September 26, 2002, but was reset to allow MCPS to conduct further observation requested by the Eisenstats.

Jacob meanwhile entered Kingsbury, where he was to remain for the entire 2002-2003 school year.

On November 14, 2002, an initial IEP meeting was convened to review the assessments and make recommendations for Jacob's placement in school year 2002-2003. The Eisenstats objected to the fact that they and their counsel could not review the school's recent speech/language and

psychological evaluations and written reports in advance of the meeting. The meeting was therefore tabled after the Eisenstats' attorney requested that, before continuing with the meeting, MCPS (1) administer the Woodcock-Johnson test to Jacob, an educational assessment comparable to the Brigance and one that MCPS did not think was appropriate based on Jacob's age and development; (2) observe Jacob in his new setting at Kingsbury; and (3) perform an occupational therapy (O/T) evaluation.

On November 20, 2002, an MCPS representative evaluated Jacob at Kingsbury. Jacob was observed as being better behaved than his classmates and his teacher's remarks provided further support for that observation. The next day, Jacob was observed in different activities and less structured settings. He appeared "on target with answering teacher questions and meeting the objectives of the lesson."

On December 19, 2002, MCPS completed an O/T evaluation for Jacob. His performance was mixed, but the conclusion was that he could benefit from direct O/T services. Due to the need to compete each of the authorized reviews and evaluations, the parties agreed to schedule their next meeting for February 13, 2003.

On February 13, 2003, an IEP meeting was convened to review the evaluation and observation reports and develop an IEP for the 2002-2003 and 2003-2004 school years, which would be kindergarten and first grade. The team identified Jacob as eligible for special education services for his ADHD and Anxiety Disorder under a code of "Other Health Impaired."

The team initially proposed an "interim placement" in the Learning and Academic Disabilities (LAD) program at Beverly Farms Elementary School (BFES), with 50% of Jacob's time to be spent in mainstream general education classes and 50% in special education. Jacob's parents objected to the placement and specifically disagreed with the speech/language pathologist's decision

not to recommend speech/language services. They requested additional phonological testing, which MCPS agreed to provide, and the meeting was again tabled, this time until April 11, 2003.

On March 5, 2003, the Eisenstats signed an enrollment contract for Jacob to attend Kingsbury for the 2003-2004 school year.

On March 10, 2003, the MCPS speech/language pathologist observed Jacob for approximately two hours at Kingsbury. In April 2003, Mrs. Eisenstat visited the LAD Program at BFES and was given a tour, during which she met with the special education coordinator and the classroom teacher that Jacob would have if he attended BFES. She concluded that the program did not meet his needs and expressed no further interest in a follow-up visit.

On April 11, 2003, the IEP team reconvened to develop an IEP. There was no dispute about the goals and objectives outlined. Speech/language services were added and it was mutually decided that Jacob's time in special education would be increased to 100%. Again, MCPS proposed the LAD Program at BFES. That program had no other current students who received a full-time special education program, so that Jacob would be the only completely self-contained student in special education at BFES. MCPS explained that the 100% special education program would only be temporary, until Jacob could gradually participate in recess, lunch, and assemblies. Until that time, MCPS felt that they could accommodate Jacob during recess and lunch periods by inviting a rotating set of students to be with him, affording him the opportunity for social interaction. They were confident that they would have no problems finding students willing to participate each day.

The Eisenstats formally rejected the team's recommendation for placement and stated that they would consider something "in between," but did not believe anything like that was available.

Jacob was re-enrolled at Kingsbury for the 2003-2004 school year.

On July 22, 2003, the Eisenstats filed a request for a due process hearing seeking funding for Jacob at Kingsbury for 2002-2003, alleging that MCPS had failed to act in a timely manner or to offer Jacob an appropriate placement.  On August 13, 2003, the Eisenstats withdrew their request.

The parties did not meet in the fall of 2003, but during the fall and winter additional neuropsychological evaluations were conducted at the request of the Eisenstats to deal with Jacob's obsessive tendencies and difficulty with emotional and behavioral self-regulation.

On January 8, 2004, the Eisenstats again filed for a due process hearing but again, on February 18, 2004, they withdrew it.  Additional private and MCPS evaluations were conducted and MCPS again undertook to observe Jacob at Kingsbury.

On March 15, 2004, an IEP meeting was convened to review the observations and evaluations then available.  A follow-up meeting was scheduled for April 21, 2004.  That meeting went forward, at which time the team again agreed to the goals and objectives of the proposed IEP but the Eisenstats took the position that Kingsbury was the only appropriate placement for Jacob. The meeting was tabled and a meeting at the central staff level was requested.

On April 22, 2004, the Eisenstats filed a third request for a due process hearing seeking funding for Jacob's placement at Kingsbury for 2002-2003 and 2003-2004.

On May 25, 2004, an IEP meeting was convened to plan for the 2004-2005 school year. The team again recommended placement for Jacob in the LAD program at BFES, but this time with 87% of Jacob's time in special education services and mainstreaming for lunch and recess with certain supports.  The plan was that  Jacob would be exposed to non-disabled peers and would have an opportunity to model upon their  behavior. The Eisenstats again rejected the placement proposal, expressing their belief that Kingsbury was the appropriate placement for Jacob.

All IEP team members acknowledged that Jacob had made progress, academically and behaviorally, at Kingsbury.  They agreed if he attended the LAD program, he would continue to receive special education and related services, including speech/language therapy, occupational therapy and mental health support.  The Eisenstats did not agree that the proposed placement was adequate.

A due process hearing was held on June 16, June 18, August 2, and August 13, 2004 before ALJ Mae Catherine Reeves.  On November 1, 2004, the ALJ issued her decision, finding that the Eisenstats had not met their burden of proving that MCPS had denied Jacob a FAPE or that they were entitled to funding at Kingsbury.

IV.

The Court considers whether Jacob was offered a FAPE for 2002-2003 and 2003-2004.

The Eisenstats argue, *inter alia*, that MCPS violated their procedural due process rights by failing to develop an IEP for Jacob in a timely fashion and their substantive rights by proposing a placement that was "plainly inappropriate" to meet Jacob's needs.

Analysis of whether a child has received a FAPE involves a two-step inquiry.   The court must first determine if the educational agency has "complied with the procedures set forth in the Act," and then ask if "the individualized education program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits[.]"  *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).  As this Court noted in *Sanger v. Montgomery County Bd. of Educ.*, 916 F. Supp. 518, 526-27 (D. Md. 1996) (citations omitted):

> First, the key consideration in any procedural analysis under IDEA is whether full and fair parental involvement in the review process has been afforded.  Second, to the extent that there may be failure to comply strictly with IDEA's procedures, the Court must consider whether the failures have caused the loss of 'educational opportunity' or are merely technical in nature.

-8-

To support a finding that a child has not been provided a FAPE, the procedural violations must be sufficiently serious as to cause the child to lose educational opportunity. *See Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990). A minor procedural violation that does not affect the provision of a FAPE will be distinguished from a violation that interferes with such a provision, *see Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997).

School systems have been held liable for failing to timely complete the IEP process, including all necessary evaluations. *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361 (D. Md. 1994). They ordinarily should have in place an IEP and placement by the start of the school year. *See Id.* at 365-66.

Here, although the Eisenstats provided MCPS with a request for services in late June or early July 2002, they argue that the school system did not forward Jacob's case to a special educator for review until September 2002, then did not complete an IEP until the end of the 2002-2003 school year.

The Court agrees that the delay in developing an IEP for Jacob was extensive. However, the ALJ placed responsibility for delays in the IEP process upon the Eisenstats themselves. As she explained: "the IEP team continually acceded to the [Eisenstats'] requests for more reports, evaluations and for the presence of MCPS staff at meetings. No meeting was tabled or continued due to the actions of the school system." (ALJ Dec. at 30.)[2] Indeed the ALJ found that the Eisenstats had failed to identify "a single time when the delay in the IEP process was caused by the school system." *Id*. Based on an independent review of the record, the Court agrees with the ALJ. The Eisenstats sought essentially duplicative testing, called for repeated observations and arranged for their own

---

[2] The Court notes that neither parent chose to testify at the administrative hearing.

evaluations -- all of which involved considerable delay.  More than once they tabled IEP meetings after requesting them.   The Court does not agree that these delays were necessary in order to allow the IEP team to gather information.  It finds no procedural violation on the part of MCPS. [3]

Even if there were a procedural violation, the Court cannot say that it actually interfered with Jacob's education. The Fourth Circuit has consistently ruled that a procedural violation which does not actually interfere with the provision of a FAPE is not sufficient to support a finding that a local education agency failed to provide a FAPE.  *Gadsby*, 109 F.3d at 956; *Tice v. Botetourt*

---

[3] As it has on more than one occasion in the past, the Court is again compelled to address the implicit "bad faith" argument that MCPS makes (and indeed the ALJ embraced) based on the view that the parents, from the beginning, made it clear that their only purpose in pursuing the IEP process was to have MCPS pay the cost of the private placement.

It is true that the Eisenstats' application for special education services was sent to MCPS three weeks after they had signed a contract with Kingsbury, enrolling Jacob for the 2002-2003 school year and obligating themselves to pay a sizeable tuition. They also signed another contract for the 2003-2004 school year in March 2003 while still engaged in the IEP process and before having visited Beverly Farms in June 2003.

Yet, as the Court has previously noted, "parents are not to be faulted simply because they may have been of a firm mind to send their child to private school, while engaged in developing an IEP for the child." *See S.M. v. Weast*, 240 F. Supp. 2d 426, 436 (D. Md. 2003).  As citizens and taxpayers, the parents are entitled to a FAPE for their child and, if the public school authorities cannot provide it, they, like all parents in that situation, are entitled to reimbursement.  But also like all parents who unilaterally place their child in private school, they act at their own risk and, if it eventuates that an ALJ or a court finds that a FAPE was in fact offered, they will receive nothing.  Further, before parents "can fairly argue that the best the school authorities had to offer was or is not good enough, the critical pre-requisite is that the parents must have cooperated with the school authorities in good faith to try to develop the IEP.  Good faith cooperation includes reasonable and timely cooperation with the school authorities." *Id.*  In this case, as distinguished from *Sanger*, the parents did not block efforts to develop an IEP.  In an effort to obtain more refined data, the Eisenstats may have created hurdles for the IEP team which resulted in delays that the Court will not accept as evidence of a denial of due process.  But the Eisenstats also participated in every meeting and worked with MCPS to share tests and evaluations, address mutual concerns and visit the MCPS programs.  They remain entitled to argue that Jacob did not receive a FAPE, even if they are foreclosed from arguing that they were denied due process.  The Court rejects any suggestion that the Eizenstats were acting in bad faith.

*County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990); *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990).  The Fourth Circuit in *DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190-92 (4th Cir. 2002), made its clearest pronouncement on this issue.  It rejected the notion of a *per se* procedural violation which could support a remedy under the IDEA separate from a showing of an actual interference with the student's education.  *Id*.  In the present case, the parents are unable to suggest any actual interference by MCPS to the provision of a FAPE to Jacob because he was never enrolled at MCPS.  Throughout the entire process, Jacob "remained at the Kingsbury Day School where he was able to make academic progress."  (ALJ Dec. at 30)

To the extent, therefore, that the parents claim that there were procedural deficiencies with regard to the IEP, the Court rejects that claim.  If there were any doubt, it may also be said that none of the alleged deficiencies in any way denied Jacob an educational opportunity.

V.

Jacob's parents fare no better with regard to their claims that the proposed IEP was substantively deficient.  Under the second step of *Rowley*, MCPS was obligated to ensure that "the individualized education program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits[.]"   *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).  The Eisenstats contend that the IEP was deficient because the proposed placement was overtly unable to meet Jacob's needs.  The ALJ disagreed and so does the Court.

Had the 2002-2003 and 2003-2004 IEPs been implemented in the LAD Program at Beverley Farms Elementary School, Jacob would have received a FAPE in the least restrictive environment (LRE).  The April 11, 2003 IEP called for him to be out of the general education environment for 100% of the time, which all the parties agreed was in his best interest at that time.  Steven Neff, a

-11-

special education supervisor, testified that the LAD team could accommodate Jacob at breaks by

bringing other students inside to share lunch or recess with him. Donna Cravath, resource teacher

and coordinator for LAD, added that staff could be creative in scheduling and provide Jacob with

a 100% special education schedule. He could have parallel activities while the other students went

to art class, a general education class typically taken by LAD students. Then the LAD program could

adjust Jacob's time out of mainstream as he adjusted, to provide the LRE possible.  Based on Jacob's

progress at Kingsbury, these adjustments were viewed as temporary.

The May 24, 2004 IEP took that progress into account.  By that time, the team wanted to

build on Jacob's substantial progress at Kingsbury by mainstreaming him to a certain extent, *i.e.* to

13%. They picked lunch and recess because they presented no specific academic demands and

would have provided opportunities for Jacob to work on his social skills.  MCPS made this decision

based on the observations of multiple County staff members who observed Jacob from a behavioral

and academic standpoint at Kingsbury. They determined that the LAD program would have given

Jacob the type of increased modeling opportunities for which he was ready. Even his teachers at

Kingsbury agreed that he had made significant social progress, which lead the ALJ to conclude that

he was ready for some mainstreaming.  Based on this evidence, the ALJ concluded that MCPS "did

offer the Child FAPE in the least restrictive environment at the LAD program at BFES for SY

2002-2003 and 2003-2004."  (ALJ Dec. at 28.)

The ALJ, correctly in the Court's view, explained that standard by which the court should

view these facts: "Once an IEP is shown to be procedurally proper, the judgment of education

professionals regarding a child's placement should be questioned only with great reluctance by the

reviewing authority."  (ALJ Dec. at 31 (citing *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200,

1207 (4th Cir. 1990))).  The issue for the Court is not whether Jacob could do better at Kingsbury

than at Beverly Farms, but rather, whether his IEP and proposed placement were calculated to provide him with some educational benefit.  Other questions of educational methodology or decision making must be left to the school system.  *Rowley*, 458 U.S. at 208-09.  In this case, the Court has little doubt that the IEP and placement were calculated to provide Jacob with some educational benefit, which is all that the law requires.  The Court finds no reason to depart from the findings of the ALJ.  Jacob was offered a FAPE for the school years in question.  With one exception,[4] the Court adopts the ALJ's findings of fact and conclusions of law as its own.

---

[4]  The Court, as indicated, takes no position relative to the ALJ's conclusion that reimbursement is not barred when the child has not previously received special education and related services under the authority of a public agency.  *See* discussion *supra* note 1.

VII.

For the foregoing reasons, the Court DENIES the Eisenstats' Motion for Summary Judgment

and GRANTS MCPS's Cross Motion for Summary Judgment.

A separate order will be entered.


September 29, 2006                        _____/s/_____
                                          **PETER J. MESSITTE**
                                          **UNITED STATES DISTRICT JUDGE**